Frank PHELPS, Appellant,

v.

JEFF WOLK CONSTRUCTION CO., Respondent.

No. 58367.

Missouri Court of Appeals, Eastern District, Division Three.

Jan. 29, 1991.

Clinton B. Roberts, Farmington, for appellant.

Robert T. Hart, St. Louis, for respondent.

STEPHAN, Judge.

Frank Phelps ("Phelps") appeals from a final award of the Labor and Industrial Relations Commission ("the Commission") affirming an order of an administrative law judge. In said order, the administrative law judge determined that: (1) Phelps' medical condition is static; (2) Phelps sustained twenty-five percent permanent partial disability to his back and body as a whole as a direct result of his accidental injury of October 22, 1985, with Jeff Wolk Construction Company ("Wolk"); (3) Phelps is not entitled to temporary total disability benefits; and (4) Phelps is not entitled to additional medical aid to cure and relieve Phelps from the effects of his accident. We affirm.

On October 22, 1985, Phelps was an employee of Wolk. In the course of his employment with Wolk, Phelps injured his back, while lifting concrete forms that he attempted to load onto a truck. Phelps testified that he sought medical attention the following day. However, it is unclear from whom such attention was sought.

Phelps notified Wolk of his injury on November 14, 1985. Subsequently, Phelps filed a Report of Injury on November 18, 1985. Wolk compensated Phelps for a twelve week period, from October 23, 1985 to January 18, 1986, at the rate of $40.00 a week. Additionally, Wolk paid Phelps' medical expenses, totaling $6,777.90. Though the record does not reflect a breakdown of Phelps' medical expenses, after reviewing the transcript of the temporary award, the transcript of the final award and the legal file, we were able to construct the following chronology of events whereby Phelps incurred medical expenses.

On November 1, 1985, Phelps obtained x-rays of his lumbar spine. These x-rays showed only degenerative changes at the L5–S1 level with some straightening of the lumbar spine indicative of spinal muscle spasm. On November 13, 1985, Phelps obtained a CAT scan of his lumbar spine. The CAT scan revealed a normal disc at the L3–4 level, a slightly bulging disc at the L4–5 level, and a degenerative disc at the L5–S1 level. On November 17, 1985, Phelps went to see a neurosurgeon, Dr. Rodney T. Routsong, D.O. Dr. Routsong concluded that Phelps suffered from severe right sacroiliac somatic dysfunction and lumbosacral strain. He recommended conservative therapy, including both physical therapy and non-steroidal anti-inflammatory medication.

On January 16, 1986, Phelps went to an orthopedic surgeon, Dr. Michael H. Ralph. Dr. Ralph informed Phelps that he could go back to work. Phelps thereafter sought employment. Although Phelps proceeded to work "off and on" for several months, Phelps eventually quit working due to alleged back pain.

In October, 1986, Phelps went to see Dr. Barrett K. Holder. Dr. Holder determined that Phelps suffered from chronic mechanical low back pain with muscle ligamentous insufficiency, degenerative disc disease at the L5–S1 level, and arthritis at the same level. Dr. Holder opined that Phelps' severe disc space narrowing and degenerative disc disease were not caused by his injury with Wolk, but may be contributory to his continuing back discomfort. Dr. Holder instructed Phelps not to work and to make another appointment so that he and Phelps could review tests he had run that day.

Phelps again saw Dr. Holder on December 3, 1986. At that time, Dr. Holder diagnosed congenital spinal stenosis, degenerative osteoarthritis of the lumbar spine, a bulging disc at L4–5, and a degenerative disc herniation at the L5–S1 level. Dr. Holder suggested to Phelps that he undergo a lumbar myelogram, to further delineate the extent of his abnormalities. Dr. Holder stated that if Phelps could perform light restricted duty or could obtain a job where he did not have to do a lot of manual labor, he could tolerate the situation. Phelps subsequently underwent a myelogram on February 4, 1987. Dr. Holder concluded that the myelogram confirmed a herniated L4–5 disc and a degenerated L5–S1 disc. He recommended that Phelps undergo Chemonucleolysis.

On April 9, 1987, Phelps saw Dr. Levy. His diagnosis revealed that Phelps had a herniated disc at L4–L5, a suspected herniated disc at L5–S1, and lumbosacral strain chronic. Dr. Levy recommended that Phelps return to Dr. Holder for further care.

Phelps then went to see Dr. Walters. Dr. Walters indicated a disc injection is risky. He stated Phelps could do some work. Dr. Walters rated Phelps' disability at twenty-five percent of the body.

Wolk's insurer subsequently arranged for Phelps to see Dr. Weiner in January, 1988. Phelps did not see Dr. Weiner, despite the fact that he received a check for mileage to Dr. Weiner's office, because: (1) he did not want to undergo x-rays; (2) he did not want to be subject to additional

tests; and (3) his counsel advised him not to do so.

In a letter dated March 2, 1988, from Dr. Holder to Wolk's attorney, Dr. Holder stated "this patient is now almost 28 months after his original injury and the chance that he would derive significant benefit from any procedure be it Chemonucleolysis or formal surgical laminectomy is extremely limited." Dr. Holder stated that he wanted to re-evaluate Phelps.

On March 28, 1988, in a hearing before an Administrative Law Judge of the Division of Workers' Compensation ("the ALJ"), Phelps sought a temporary award for medical aid and temporary total disability benefits. The ALJ determined that Phelps was entitled to twelve weeks of temporary total disability at a rate of $133.33 per week, for a total of $1,599.96. The ALJ offset the $480.00 previously paid by Wolk, leaving a $1,119.96 balance payable to Phelps. The ALJ additionally determined that Phelps was entitled to receive medical aid to cure and relieve Phelps from the effects of his accidental injury of October 22, 1985. The ALJ directed Wolk to furnish Phelps with all necessary medical attention.

After the temporary award, Phelps continued to see doctors, thereby incurring additional medical expenses. On August 11, 1988, at the request of Wolk's attorney, Phelps saw Dr. Otakar Machek. In a letter to Wolk's attorney, dated the same day, Dr. Machek stated:

> there is steady magnification and multiplication of symptoms since 1985 there is a little pain behavior and no question about exaggeration. The subjective neurological deficit couldn't be documented, and the abnormal gait was proved to be on a voluntary basis. I have yet to see a 46 year old construction or concrete worker who has never had back pain. Diagnosis: Back strain, objectively resolved, subjectively not. History of hypertension.
> The patient reached maximum benefit of treatment. I think surgery would complicate and magnify the complaints and increase disability. He would probably

end up with not one, but several, surgical procedures if my judgment is correct. Objectively there is no physical disability. Therefore, the rating would be based on subjective complaints. The patient is of the opinion that he cannot work. However, I am unable to comprehend the reason on which this is based.

One month later, on September 13, 1988, Phelps again went to see Dr. Holder. Following the appointment, Dr. Holder wrote a letter to Wolk's attorney, in which he stated: "I have discussed quite frankly with the patient and his wife that any intervention procedure, be it surgical laminectomy or chemonucleolysis, or possible spine fusion would not make him any better or functional than he appears in the office today. Any intervention procedure carries with it of course surgical risks." Dr. Holder noted that Phelps was to see him again, in two weeks.

On October 3, 1988, Phelps returned to Dr. Holder. In a letter to Wolk's attorney, Dr. Holder opined that Phelps had a bulging and/or herniated disc at the L4–5 level. Additionally, Dr. Holder determined that Phelps has an associated disc abnormality at the L5–S1 level. Dr. Holder stated: "I explained carefully to the patient and his wife that it is now three years after his original injury, and one could expect no more than a 60 to 70% chance of deriving benefit from any form of invasive therapy, be it Chemonucleolysis or formal laminectomy. There is a 20 to 30% chance of being the same, and there is a possibility of being made worse." Dr. Holder additionally stated: "I did note to the patient that strong consideration should be given to accepting total disability from the concrete industry, and perhaps seeking future employment in a field which involves only clerical or office type work."

One week later, Dr. Holder referred Phelps to Dr. John Krettek, a neurosurgeon, for possible surgical laminectomy and disc removal. In a letter to Dr. Krettek, Dr. Holder stated: "I feel if this patient is denied Chemonucleolysis then surgical laminectomy is certainly a reasonable alternative." Phelps never saw Krettek,

apparently because Wolk's insurer would not authorize it.

On September 19, 1989, Phelps again appeared before the ALJ. Phelps requested that Wolk furnish medical aid. He also sought temporary total disability benefits since the last hearing. At this hearing, Dr. Holder appeared for Phelps, and Dr. Machek appeared for Wolk. Dr. Holder testified: "[i]t is my opinion that he deserves and would benefit greatly from surgical laminectomy and take out a ruptured disk in his back and he was [referred] to Dr. John Krettek, neurologist." Dr. Holder further testified that Phelps will be disabled unless he has this surgery.

Dr. Machek, however, testified that he was unable to document abnormality in Phelps' physical examination. Dr. Machek stated that he noticed a magnification and multiplication of symptoms. Dr. Machek concluded that Phelps did not need any further treatment. Dr. Machek assigned a permanent partial disability rating of two and a half to five percent of the man as a whole.

In an order dated January 4, 1991, the ALJ determined that: (1) Phelps' medical condition is static; (2) Phelps sustained twenty-five percent permanent partial disability to his back and body as a whole, as a direct result of his accidental injury of October 22, 1985 with Wolk; (3) Phelps is not entitled to temporary total disability benefits; and (4) Phelps is not entitled to additional medical aid to cure and relieve Phelps from the effects of his accident. The ALJ ordered Wolk to pay Phelps 100 weeks of compensation at a rate of $133.33 per week, for a total of $13,330. On January 18, 1990, Phelps submitted an Application for Review. The Labor and Industrial Relations Commission subsequently entered the final award, affirming the ALJ, on April 13, 1990. It is from this award that Phelps appeals.

We turn now to Phelps' four points on appeal. First, Phelps challenges the Commission's jurisdiction. Phelps contends that the Commission exceeded its jurisdiction since the ALJ awarded permanent partial disability when: (1) the issue was not presented at the hearing; and (2) Phelps had no opportunity to present evidence concerning either permanent partial disability or total disability. Second, Phelps challenges the permanent partial disability award. Third, Phelps challenges the sufficiency of medical treatment that Wolk provided to Phelps. Finally, Phelps challenges the relevancy and materiality of the evidence the Commission considered in rendering its decision.

■ We will affirm the Commission's decision if, after reviewing the entire record in the light most favorable to the finding, we believe the award is supported by competent and substantial evidence. *Mattera v. Tarlton*, 743 S.W.2d 887, 888 (Mo.App. 1987). As was previously stated, Phelps' first point is that the Commission exceeded its jurisdiction. Specifically, Phelps contends that the ALJ erroneously awarded Phelps permanent partial disability since: (1) Phelps requested medical aid and temporary total disability; and (2) Phelps did not have an opportunity to present evidence concerning either permanent partial disability or total disability. Phelps' contentions are without merit.

■ The definition of total disability is the "inability to return to *any* employment and not merely the inability to return to the employment in which the employee was engaged at the time of the accident." *Crum v. Sachs Electric*, 769 S.W.2d 131, 133 (Mo.App.1989). The term "any employment" means any reasonable or normal employment or occupation. *Id.* Temporary disability awards are intended to cover a healing period. *Williams v. Pillsbury Co.*, 694 S.W.2d 488, 489 (Mo.App.1985). Temporary total disability is only to be granted for the time prior to when the employee can return to work. *Id.*

■ It is the Commission's duty, not the reviewing court's, to review the entire record, determine the credibility of the witnesses, decide the weight to be given their testimony, resolve conflicts threrein, and reach its own conclusion. *Crum v. Sachs Electric, supra*, 769 S.W.2d at 133. In the case at bar, in a letter dated September 13,

1988, Phelps' own witness, Dr. Holder, stated, "I have discussed quite frankly with the patient and his wife that any intervention procedure, be it surgical laminectomy or chemonucleolysis, or possible spine fusion would not make him any better or functional than he appears in the office today." Three weeks later, in a letter dated October 3, 1988, Dr. Holder stated "one could expect no more than a 60 to 70% chance of deriving benefit from any form of invasive therapy, be it Chemonucleolysis or formal laminectomy. There is a 20 to 30% chance of being the same, and there is a possibility of being made worse." Dr. Holder also stated Phelps perhaps could seek "future employment in a field which involves only clerical or office type work."

Wolk's witness, Dr. Machek, testified that Phelps reached the maximum benefit of treatment. In a letter dated August 12, 1988, Dr. Machek stated he was unable to comprehend why Phelps could not work. Dr. Machek assigned a permanent partial disability of two and a half to five percent of the man as a whole.

Since both physicians determined that Phelps has reached the point that further progress is not expected, a temporary award is not warranted. *Williams v. Pillsbury Co., supra,* 694 S.W.2d at 489. Moreover, since both physicians indicated that Phelps is capable of working, a total disability award is not warranted. *Crum v. Sachs Electric, supra,* 769 S.W.2d at 133. The permanent partial award was intended to cover Phelps' permanent limitations due to the accident of October 22, 1985, and any restrictions his limitations may impose on employment opportunities. The Commission's decision is supported by competent and substantial evidence. Phelps' first point is denied.

We now turn to Phelps' second and fourth points for neither of which he cites any authority. Phelps' second point is that the Commission erred in awarding permanent partial disability. Phelps' fourth point is that the Commission considered irrelevant and immaterial evidence in rendering its decision.

Rule 84.04(d) provides in part: "[t]he points relied on shall state briefly and concisely what actions or rulings of the court are sought to be reviewed and wherein and why they are claimed to be erroneous, *with citations of authorities thereunder.*" (Emphasis ours.) The requirements of Rule 84.04(d) are mandatory. *Roden v. Tofle,* 779 S.W.2d 290, 293 (Mo.App.1989). If the point of error is one for which precedent is appropriate and available, then it is the obligation of the appellant to cite relevant authority if he expects to prevail on appeal. *Black v. Cowan Construction Co.,* 738 S.W.2d 617, 619 (Mo.App.1987). If the point of error is one for which it does not appear that precedent for or against the point is available, the appellant should so state, with an explanation of why citations are unavailable. *Roden v. Tofle, supra,* 779 S.W.2d at 293.

When a party fails in his duty by filing briefs which are not in conformity with the applicable rules and do not sufficiently advise the court of the contentions asserted and the merit thereof, the court is left with the dilemma of deciding the case on the basis of inadequate briefing and advocacy or undertaking additional research and briefing to supply the deficiency. *Thummel v. King,* 570 S.W.2d 679, 686 (Mo. banc 1978). Courts should not be asked or expected to assume this role. *Id.* Not only would this be inherently unfair to the other party on appeal, it is unfair to parties in other cases awaiting disposition because it takes from them appellate time and resources which should be devoted to expeditious resolution of their appeals. *Id.* Thus, a point of error unsupported by a citation of relevant authority is deemed abandoned. *Wright v. Martin,* 674 S.W.2d 238, 242 (Mo.App.1984).

Phelps' points were drafted with blatant disregard of the requirements of Rule 84.04(d). Phelps neither cites authority to support his second and fourth points, nor does he explain why citations are unavailable. Since these points are not so novel or unique that authorities would not be available, we consider them abandoned.

Phelps' third point on appeal is that the Commission erred in ruling as it did because there was no competent evidence in the record to show that Wolk provided medical treatment to Phelps as required by Phelps' temporary award. Specifically, Phelps contends that the Commission erred in: (1) accepting Dr. Machek's testimony; and (2) using his medical opinion to determine that Phelps did not need additional medical treatment. In support of this contention, Phelps argues that Wolk's insurer, not Wolk, selected Dr. Machek as a treating physician, in violation of Section 287.140.9. He cites *Teale v. American Manufacturers Mutual Insurance Co.*, 687 S.W.2d 218, 220 (Mo.App.1984), wherein our brethren in the Western District determined that the purpose of Section 287.140.9 was to deny insurers any voice in directing workers to particular doctors or classes of doctors for treatment of job-related injuries.

Phelps' contention is without merit. While Section 287.140.9 does state: "[t]he employer shall have the right to select the licensed treating physician", there is competent and substantial evidence that confirms that this is exactly what happened here. In a letter from Wolk's attorney to Dr. Machek, dated July 14, 1988, Wolk's attorney states: "[y]ou are to see and examine Mr. Phelps *at our request.*" (Emphasis ours.) This letter indicates that the decision to have Phelps see Dr. Machek was Wolk's decision, not Wolk's insurer. Moreover, even if Wolk's insurer did contribute to the decision to have Phelps see Dr. Machek, this is not prohibited under the Workers' Compensation Law. Rather, an insurer may discuss with an employer the reasonable medical needs of an employee, including the treating physician. While an employer and the insurer are free to discuss the appropriateness of an employee's treating physician, the insurer is prohibited from directing or mandating an appropriate treating physician. In the event of a difference of opinion, the decision of the employer prevails. Since: (1) there is competent and substantial evidence that Wolk, not Wolk's insurer, selected Dr. Machek as Phelps' treating physician; and (2)

there is no evidence to indicate that Wolk's insurer mandated an appropriate treating physician, Phelps' fourth point is denied.

After reviewing the entire record, we hold that the Commission's award is supported by competent and substantial evidence. We therefore affirm.

REINHARD, P.J., and CRANE, J., concur.