**Gerrie HERRING, Respondent,**

**v.**

**YELLOW FREIGHT SYSTEM, INC., Appellant,**

**Treasurer of Missouri, Custodian Secondary Injury Fund, Respondent.**

**No. WD 50713.**

Missouri Court of Appeals, Western District.

Dec. 19, 1995.

As Modified Jan. 30, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 30, 1996.

David B. Mandelbaum, Overland Park, Kansas, for Yellow Freight System, Inc.

Theodore D. Barnes, Independence, for Gerrie Herring.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, Matthew Queen, Asst. Atty. Gen., Kansas City, for Second Injury Fund.

Before BERREY, P.J., and ULRICH and ELLIS, JJ.

ELLIS, Judge.

Yellow Freight System, Inc. ("Yellow Freight") appeals the decision of the Labor and Industrial Relations Commission awarding Gerrie Herring 15% permanent partial disability to the right arm at the 232 week level, temporary total disability for 66 and 5/7 weeks, and unpaid medical bills in the amount of $3,994.60.

Herring, an employee of Yellow Freight for sixteen years, filed three separate claims for benefits pursuant to the Missouri Workers' Compensation Act for accidents which occurred on February 10, 1990, March 13, 1991, and September 5, 1991. On February 10, 1990, Herring was injured when an impact socket he was using to change a truck tire separated from its air wrench. Because his right arm was injured in the February 10 accident, it was necessary for Herring to use his left arm to get in and out of the trucks at Yellow Freight and on March 13, 1991, he injured his back as he was using his left arm to get into a truck at Yellow Freight's terminal facility. On September 5, 1991, Herring was injured as he turned over a fifth-wheel, a 250 pound steel plate used to attach trailers, in the wash rack area of the terminal.

Immediately following the September 5 accident, Herring reported the injury to Lynn Smith, a supervisor at the shop. Pursuant to Yellow Freight's policy, Smith filled out an accident report and ordered a cab to take Herring to the Industrial Clinic North, Yellow Freight's authorized medical clinic, where Herring was examined by Dr. Andrew McCanse. After taking a history from Herring and examining him, Dr. McCanse diagnosed Herring as having "right chest wall pain" and released him to resume his normal duties. Dr. McCanse found no objective manifestation of injury or cause for Herring's complaints. Dr. McCanse gave Herring a "green card" to give to his employer which reflected Dr. McCanse's diagnosis and release to resume work.

After Dr. McCanse released Herring to return to work, Herring returned to Yellow Freight's terminal and gave the green card to his supervisor, Greg Filer. However, rather than resuming work, Herring asked a co-worker to drive him to the Kansas University Medical Center ("K.U.M.C.") for treatment. K.U.M.C.'s Emergency Room Report dated September 5, 1991 ordered light duty restrictions for Herring until the next scheduled appointment at K.U.M.C. on September 11, 1991. When Herring presented this report to Filer the following day, Filer told him not to return to work until he was "100% fit." Despite Herring's repeated attempts to return to work under Yellow Freight's modified work program, Yellow Freight would not allow Herring to return to work until his doctors released him to full duty. Herring filed workers' compensation claims for all three injuries.

On March 24, 1992, the Administrative Law Judge conducted a hardship hearing regarding the February 10, 1990 accident, following which he issued a temporary award. In its findings and conclusions, the ALJ found Herring had suffered an injury on February 10, 1990. At that time, Yellow Freight had paid for all Herring's medical attention following that accident, totaling $4,413.21, and Yellow Freight had paid Herring temporary total disability benefits from February 11, 1990 through April 2, 1990, June 8, 1990 through July 8, 1990, and September 12, 1990 through December 5, 1990 when he returned to work. The ALJ indicated in his findings that the September 5, 1991 incident was merely an "aggravation" of the February 10, 1990 injury and found Herring had failed to prove he was temporarily and totally disabled as of September 5, 1991.

On November 16, 1992, Herring filed a claim for compensation against Yellow

Freight and Missouri's Second Injury Fund with the Missouri Department of Labor and Industrial Relations Division of Workers' Compensation for permanent partial disability resulting from the September 5, 1991 injury. Yellow Freight answered, denying Herring was injured by an accident arising in the course of employment. It also denied Herring had sustained any subsisting disability. It further alleged Herring had failed to properly notify Yellow Freight within the time provided by law. The Treasurer of the State of Missouri as custodian of the Second Injury Fund also answered, stating it was without knowledge or information to form a belief as to the truth of Herring's allegations. Herring subsequently filed an amended claim for compensation, with minor changes, and Yellow Freight filed an amended answer substantially the same as its original except to add that Herring's claim was barred by the statute of limitations.

The ALJ conducted a final hearing regarding all three accidents on December 9, 1993, and issued an award and findings of fact in which it found Herring did suffer compensable injuries on March 13, 1991 and September 5, 1991, but contrary to Herring's assertion, he was not temporarily and totally disabled following the September 5, 1991 accident. In support of its decision denying temporary total disability, the ALJ referred to the earlier hardship hearing and to video tapes of Herring performing strenuous activities as well as to Herring's testimony that he attempted to return to work ten or twelve times during the period he claimed to be disabled. The ALJ further found that as a result of the February 10, 1990 injury, Herring had suffered a permanent partial disability of 15% in his right arm at the 232-week level for which he was entitled to permanent partial disability benefits totaling $6,049.98, but that he was not entitled to any additional medical treatment from Yellow Freight for any of his injuries.[1] It awarded no compensation for the September 5, 1991 accident and denied Herring's claim for Second Injury Fund compensation benefits.

After Herring filed an application for review, the Commission issued an award modifying the award of the ALJ. It awarded, in addition to the award of the ALJ, 66 and 5/7 weeks of temporary total disability for a total of $28,771.16 [2] and unpaid medical bills in the amount of $3,994.60. The Commission stated:

> The administrative law judge correctly ruled that employee Gerrie Herring sustained an accident at work on September 5, 1991 while employed at Yellow Freight Systems, Inc. The administrative law judge awarded permanent partial disability for that injury but denied reimbursement for medical aid and temporary total disability. The Commission majority [3] finds the greater weight of the evidence supports an award of temporary total disability and reimbursement for medical expenses incurred by employee in obtaining treatment for his injuries arising out of the September 5, 1991 injury.

In reviewing the decision of the Commission, we apply a two-step process to determine whether the Commission could have made its findings and award upon consideration of all the evidence before it. *Davis v. Research Medical Center,* 903 S.W.2d 557, 571 (Mo.App.1995).

> In the first step, the court examines the whole record, viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award, to determine if the record contains sufficient competent and substantial evidence to support the award. If not, the Commission's award must be reversed. If there is competent and substantial evidence supporting the award, the court moves to the second step, where it views the evidence in the light most favorable to the award, but must consider all evidence in the record,

1. Yellow Freight had already paid Herring $7,740.40 and $2,214.64 in temporary total disability benefits for his February 10, 1990 and March 13, 1991 injuries, respectively. It had also paid $5,985.73 and $2,296.84, respectively, in medical benefits for those two injuries.

2. Herring's treating physician, Dr. Redford, had released Herring to resume full work in December, 1992.

3. One of the commissioners dissented from the Commission's decision.

> including that which opposes or is unfavorable to the award, take account of the overall effect of all of the evidence, and determine whether the award is against the overwhelming weight of the evidence. In doing so, it takes into consideration the credibility determinations of the Commission and, if those determinations as to witnesses who gave live testimony before the ALJ are different than those made by the ALJ, it also considers the ALJ's credibility findings as well as the reasons, if any are given, why the Commission differed with those findings.

*Id.*

On appeal, Yellow Freight delineates four points. It challenges the Commission's findings regarding its award of temporary total disability from September 5, 1991 to December 16, 1992, its award of medical aid following the September 5, 1991 accident, and its award of permanent partial disability arising out of his February 10, 1990 injury. As to each of these arguments, Yellow Freight is, in essence, contending that there is not sufficient competent and substantial evidence to support the award under the first step of our review. Therefore, in deciding these questions, we must examine the whole record, view the evidence and all reasonable inferences in the light most favorable to the Commission's award, and determine whether there is sufficient competent and substantial evidence to support the Commission's decision. *Id.* In its final point, Yellow Freight asks that we move to the second phase of review, asserting that the entire award is against the overwhelming weight of the evidence.

Regarding the award of temporary total disability from September 5, 1991 to December 16, 1992, Yellow Freight contends the evidence proved Herring was capable of performing work throughout the entire period, and therefore, the decision to award him temporary total disability compensation for that period was error.

Section 287.020.7[4] provides:

> The term "total disability" as used in this chapter shall mean inability to return to any employment and not merely mean inability to return to the employment in which the employee was engaged at the time of the accident.

"In other words, total disability means the inability to return to any reasonable or normal employment." *Faubion v. Swift Adhesives Co.,* 869 S.W.2d 839, 841 (Mo.App.1994).

While "total disability" is defined by § 287.012.7, the statutes do not define "temporary total disability." However, as the court in *Williams v. Pillsbury Co.,* 694 S.W.2d 488 (Mo.App.1985), stated:

> Temporary disability awards are intended to cover a healing period. Temporary total disability is to be granted only for the time prior to when the employee can return to work. Temporary partial disability is to be awarded during the healing period to compensate the employee for the reduction in his working ability during the healing period.

*Id.* at 489 (citation omitted). Thus, to support an award for temporary total disability, the evidence must show Herring was unable to return to any reasonable employment during his healing period. It is Yellow Freight's contention that the evidence showed Herring was able to work between September 5, 1991 to December 16, 1992.

However, the record before us contains evidence of several doctors' opinions that Herring could not return to his regular job at Yellow Freight following the September 5, 1991 accident. In fact, at least two notes from Dr. Redford, dated December 6, 1991 and February 6, 1992, state Herring was unable to return to work, even at light duty, until February 29, 1992.

Further, and of particular significance, the evidence showed that pursuant to a union agreement, Yellow Freight had a modified work program which was designed to provide injured workers with lighter work assignments. When Herring's doctors placed him on restricted duty, Herring repeatedly requested that Yellow Freight offer him lighter jobs under the modified work program but was denied lighter work and was told by his

4. All statutory references are to RSMo 1994.

supervisor that he could not return to work until he had completely recovered.

In its decision, the Commission pointed out that Yellow Freight was aware Herring had been placed on restricted duty but refused to offer him modified work despite Yellow Freight's policy to do so and Herring's multiple requests for modified work. If Yellow Freight refused to give Herring work under its modified work program, it was reasonable for the Commission to conclude Herring could not find reasonable employment, thereby satisfying the statutory definition of "totally disabled." The record contained sufficient evidence to support the Commission's finding that Herring was temporarily totally disabled.[5]

Yellow Freight next challenges the award of temporary total disability. It contends the Commission's reliance on the opinion of Dr. John B. Redford, a specialist in physical and rehabilitation medicine who testified regarding his treatment of Herring, was error because Dr. Redford's determination that Herring was temporarily and totally disabled was based on an erroneous standard. Yellow Freight contends that rather than using the standard set forth in § 287.020.7, Dr. Redford considered Herring to be totally disabled solely because "he could not use his shoulder and arm in the heavy work he was involved in...." Thus, according to Yellow Freight, by relying on Dr. Redford's opinion, the Commission substituted a standard of "maximum medical improvement" or "ability to return to his former job" for the standard set forth in § 287.020.7.

Yellow Freight's argument is erroneous because the Commission did not rely solely on Dr. Redford's opinion nor did it apply a "maximum medical improvement" standard. Nowhere in its decision does the Commission refer to such a standard. Furthermore, as it stated in its decision, in addition to Dr. Redford's opinion, the Commission relied on work restriction notices signed by Herring's treating physician, Herring's testimony, Dr. McCanse's progress note entries, and other evidence of Herring's physical condition after the September 5, 1991 accident. Consequently, the record contains sufficient competent evidence to support the Commission's award of temporary total disability following the September 5, 1991 accident.

In challenging the award of the cost of medical aid following the September 5, 1991 accident, Yellow Freight alleges the Commission's award is not supported by the evidence because Herring elected to pursue treatment through his own physicians from whom he had already been receiving treatment and because Herring failed to prove the services were reasonable, necessary, or related to the alleged September 5 injury.

Under § 287.140.1, the employer must provide such medical treatment as may reasonably be required after the injury or disability to cure and relieve from the effects of the

5. Yellow Freight cites several cases holding that the central question in determining whether a person is totally disabled is whether any employer in the usual course of business would reasonably be expected to employ the employee in his present physical condition. *See, e.g., Kowalski v. M–G Metals & Sales, Inc.*, 631 S.W.2d 919, 922 (Mo.App.1982); *Faubion*, 869 S.W.2d at 841. However, none of the cases cited by Yellow Freight support its position that Herring was not temporarily totally disabled. In the first place, in relying on these cases, Yellow Freight emphasizes the fact that Herring was released to restricted work and repeatedly requested modified work to support its position that Herring could work and therefore failed to meet the definition requiring him to be unemployable in any reasonable employment. On the contrary, as we have already said, the fact that Herring was refused work under Yellow Freight's modified work program supports the Commission's finding he was totally disabled. Furthermore, the cases cited by Yellow Freight all deal with permanent total disability rather than temporary total disability. The finding that Herring was unable to find "any reasonable employment" could have been affected by the fact he was temporarily disabled rather than permanently disabled.

Yellow Freight cites *Isacc v. Atlas Plastic Corp.*, 793 S.W.2d 165, 166 (Mo.App.1990) which held that the test for total disability is whether, given the employee's situation and condition, he is competent to compete in the open labor market. It is significant that all of the cases Yellow Freight cites deal with permanent total disability because the "open labor market" standard he refers to comes from § 287.180 which applies to permanent total disability. *See Williams v. Pillsbury Co.*, 694 S.W.2d 488 (Mo.App.1985). Temporary total disability involves § 287.170 which does not refer to the open labor market.

injury and, if the employee desires, he shall have the right to select his own physician, surgeon, or other such medical requirement at his own expense. Yellow Freight contends it provided reasonable medical treatment by sending Herring to the clinic where he was examined by Dr. McCanse. It asserts that after Dr. McCanse made his diagnosis that Herring did not need further treatment, its responsibility for medical treatment ended and Herring's use of the K.U.M.C. physicians must be at his own expense.

Contrary to Yellow Freight's assertion, the record contains substantial evidence supporting the finding that Herring was in need of further medical treatment after he saw Dr. McCanse on September 5, 1991. The September 5 emergency report and several doctors from K.U.M.C. recommended further treatment and restricted work duty following the September 5, 1991 accident. The record further reveals Yellow Freight was repeatedly informed by Herring's treating physicians that he could not resume regular work, and Herring's supervisor acknowledged Herring's need of further treatment by telling him he could not return to work until he was "100% fit."

"While the employer has the right to name the treating physician, the employer may waive that right by failing or neglecting to provide necessary medical aid." *Emert v. Ford Motor Co.*, 863 S.W.2d 629, 631 (Mo. App.1993); *Shores v. General Motors Corp.*, 842 S.W.2d 929, 931 (Mo.App.1992) ("Where the employer with notice of an injury refuses or neglects to provide necessary medical care, the [claimant] may make his own selection and have the cost assessed against the employer."). Herring provided substantial evidence that he needed additional medical aid following the September 5 accident. Yellow Freight failed to provide that necessary medical aid. Therefore, Herring was justified in seeking out his own physicians at Yellow Freight's expense. As the Commission pointed out in its decision, there is substantial evidence in the record that Yellow Freight had notice of Herring's injury and that it refused to provide medical treatment. Thus, the Commission's award of the cost of Herring's medical aid following the September 5, 1991 injury was supported by substantial evidence.[6]

Yellow Freight next alleges error in the Commission's award of permanent partial disability arising out of his February 10, 1990 injury, asserting Herring failed to prove any amount of his permanent partial disability was related to any particular injury or compensable event. It contends that none of the examining physicians could distinguish the amount of disability produced by the February 10 injury from a pre-existing disability or from the amount of disability produced by each of his subsequent injuries. Yellow Freight cites *Griggs v. A.B. Chance Co.*, 503 S.W.2d 697, 704 (Mo.App.1973), which states:

> The rule is that the burden of proof rests on the claimant in a workman's compensation proceeding, and it is not sufficient for recovery to show only that the injury complained of resulted either from one or the other of two causes, for one of which, but not the other, the employer would be liable. The claimant must produce evidence from which it reasonably may be found that such injury resulted from the cause for which the employer would be liable.

Yellow Freight contends Herring did not prove how much of the permanent partial disability is attributable to the February 10,

6. The cases cited by Yellow Freight are not applicable to the case at bar. First, it cites *Reeves v. Fraser-Brace Eng'g Co.*, 237 Mo.App. 473, 172 S.W.2d 274 (1943), and *Finn v. Harrison*, 255 S.W.2d 93 (Mo.App.1953), which hold that where a worker refuses medical attention tendered by the employer and then selects his own physician, the employer is not liable for those expenses. Herring did not refuse any medical treatment offered by Yellow Freight. He went to the clinic authorized by Yellow Freight and was told he needed no more treatment.

Yellow Freight also cites *Cox v. General Motors Corp.*, 691 S.W.2d 294 (Mo.App.1985), which stated that generally, a worker's compensation claimant is not entitled to medical compensation where he has suffered no disability as a result of the accident upon which his claim is premised. In contrast, the record in the case at bar supports the finding Herring suffered a disability as a result of the September 5 accident.

1990 accident as opposed to a 1984 accident for which Herring has already settled. However, the record contains substantial evidence that the assessment of 15% permanent partial disability was attributed to the February 10, 1990 accident and not to the 1984 accident. Dr. Redford wrote a letter advising Yellow Freight that in his opinion, Herring had suffered permanent partial disability of 10% as a result of the February 10, 1990 and September 5, 1991 accidents. Furthermore, at the final hearing, Dr. Redford was specifically questioned on the issue of whether this diagnosis was solely attributed to the injuries he sustained while at Yellow Freight. He testified that although he was not very familiar with the details of the 1984 injury, he did know that the earlier injury was diagnosed as thoracic outlet syndrome which involves the upper shoulder or neck, whereas Herring's February, 1990 injury involved the sternum or lower part of the shoulder and that the two injuries were "separate and distinct."

In addition, Dr. Dennison R. Hamilton testified that he rated Herring to be 15–20% disabled. He testified this was due to the shoulder injury only and had nothing to do with the previous rib resection or the earlier shoulder injury:

Q. And it's possible, is it not, Doctor, that some of the disability that he has now is attributable to the injury that produced or the injury for which the right rib resection was a treatment, is it not?

A. I don't think so, because as I read the medical records, he had what was described as a thoracic outlet brachial plex-type injury. He didn't have any neurological loss in his arms when I evaluated. So I don't think that the rating that I did on him had anything to do with the prior rib resection or thoracic outlet condition.

Dr. Hamilton also explained how the video tapes of Herring performing what appeared to be strenuous activities could be deceiving because the tapes do not reveal how Herring could be favoring his arm. In addition, in a letter dated January 20, 1993, Dr. Hamilton wrote:

> It is my opinion that Gerrie Herring has a 15%–20% impairment of the right upper extremity that is solely and directly attributable to the initial injury that he sustained of the right shoulder on 2/10/90, and the multiple exacerbations that he has experienced since that time.

Based on the testimony and evidence from Dr. Redford and Dr. Hamilton, the record contains substantial evidence supporting the Commission's decision that Herring suffered a permanent partial disability following the February 10, 1990 injury.

Upon examination of the whole record, we conclude that there is sufficient competent and substantial evidence to support the award of temporary total disability from September 5, 1991 to December 16, 1992, the award of the cost of medical aid following the September 5, 1991 accident, and the award of 15% permanent partial disability.

In its final point, Yellow Freight contends the Commission's decision is against the overwhelming weight of the evidence because the overwhelming weight of the evidence proved Herring received no disability from the alleged February 10, 1990 injury and he was not temporarily and totally disabled as a result of the alleged September 5, 1991 injury. Yellow Freight claims the decision is against the overwhelming weight of the evidence because Herring is not credible in that "every objective source of fact clearly contradicts the version proffered by [Herring] and proves that [Herring] has been untruthful as to every material aspect of his case." To support this point, Yellow Freight asserts that all of Herring's symptoms predated the September 5, 1991 accident and that none of the six physicians who examined Herring found objective findings to explain Herring's complaints.

Here we move to the second step of our review of the Commission's award, *Davis*, 903 S.W.2d at 571, where we view the evidence in the light most favorable to the award, but nevertheless consider all evidence in the record, including that evidence which is unfavorable to the award, and determine whether the award is against the overwhelming weight of the evidence. *Id.* We take into

consideration the credibility determinations of the Commission and, if those determinations as to witnesses who gave live testimony before the ALJ are different than those made by the ALJ, we also consider the ALJ's credibility findings as well as the reasons, if any are given, why the Commission differed with the ALJ's credibility findings. *Id.*

Yellow Freight's argument is essentially that there were numerous inconsistencies and contradictions in Herring's testimony and therefore he was not a credible witness. It combines this contention with its position that there were no objective manifestations of physical problems which would explain the symptoms he claimed, and further asserts there was no "objective" evidence to support the Commission's award. While the Commission differed with the ALJ on certain credibility determinations, Yellow Freight makes no mention of those differences and does not rely on them in contending that the award is against the overwhelming weight of the evidence. Rather, it uses a broad brush to discuss evidence which is contradictory of the award.

We have reviewed the entire record, and have duly considered those findings of the ALJ which the Commission rejected. We cannot say that Herring's evidence was inherently improbable or so inconsistent or contradictory as to make either the ALJ's or the Commission's reliance on it injudicious or unreasonable. Herring's testimony, the emergency room report, the doctors' testimony and reports restricting Herring to light duty, as well as Yellow Freight's refusal to allow Herring to work in its modified work program provide ample evidence to support the Commission's award. In sum, the record contains sufficient competent and substantial evidence to support the award, the decision was a reasonable result for the Commission to reach on consideration of all the evidence, and it was not contrary to the overwhelming weight of the evidence.

The judgment is affirmed.

All concur.