**Randy D. BOYLES, Respondent,**

v.

**USA REBAR PLACEMENT, INC., and Hartford Insurance Company, Appellants.**

**No. WD 57730.**

Missouri Court of Appeals, Western District.

July 25, 2000.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 29, 2000.

Application for Transfer Denied Oct. 3, 2000.

Thomas Hill, Kansas City, for appellant.

Frank Eppright, Ellaine Eppright, Kansas City, for respondent.

PAUL M. SPINDEN, Judge.

USA Rebar Placement, Inc., and Hartford Insurance Company appeal from the Labor and Industrial Relations Commission's decision[1] to award temporary, total disability benefits and future medical care to USA Rebar employee Randy D. Boyles. They contend that the commission's decision was not supported by competent and substantial evidence. They assert that Boyles could have found employment even though his physician had placed lifting and bending restrictions on him, so Boyles was not entitled to temporary, total disability benefits. They also contend that Boyles did not establish that he would need future medical care. We affirm the commission's decision in part and reverse in part.

The evidence established that, on September 15, 1994, Boyles injured his back while working at USA Rebar. Eleven days later, he consulted with David Ebelke, a physician selected by USA Rebar, who diagnosed Boyles' problem as lumbar strain and a preexisting condition, L5 spondylolysis and L5–S1 spondylolisthesis. Ebelke advised Boyles not to work for about a month. On October 25, 1994,

---

1. Although no judicial officer recognized by Mo. CONST., art. V (1945), has issued a judgment in this case, we presume we have jurisdiction to consider an appeal directly from the commission by the authority of § 287.495, RSMo Supp.1999, and Mo. CONST., art. V, § 18. Our presumption is consistent with the Supreme Court's finding of jurisdiction in workers' compensation cases pursuant to § 287.495 in *Goodrum v. Asplundh Tree Expert Co.*, 824 S.W.2d 6, 8–9 (Mo. banc 1992).

Ebelke advised Boyles again not to return to work and recommended a "work hardening program" for at least a month.

On November 22, 1994, Ebelke decided that Boyles could return to work if he lifted no more than 50 pounds occasionally and 35 pounds repetitively. He also told Boyles to bend forward at his knees or to kneel rather than bending forward at his waist, and he told Boyles that he should work no more than four hours a day the first week, six hours a day the second week, and eight hours a day thereafter. Ebelke said that these restrictions were temporary until he could reexamine him on January 9, 1995.

On November 23, 1994, Dan Wolfe of USA Rebar advised Ebelke that he did not know whether they would have work that conformed to Ebelke's restrictions. Wolfe asked Ebelke to consider keeping Boyles in therapy for at least another week. On November 29, 1994, Alice Padget, a rehabilitation nurse with Hartford Insurance, told Ebelke that USA Rebar would not accommodate the work restrictions, so Ebelke returned Boyles to the work hardening program for another month.

On January 9, 1995, Ebelke told Boyles that he could lift no more than 75 pounds occasionally and 35 pounds repetitively. He also told him to avoid repetitive bending at the waist. Boyles immediately checked with USA Rebar about the restrictions, and his supervisors told him that they could not use him with those restrictions. In Boyle's medical chart, Ebelke wrote:

[H]e is currently at maximum medical improvement for what non-operative treatment has to offer, and his current symptoms don't seem to be bad enough to consider surgery at this time. He still might be a candidate for surgery further down the road if his pain should get worse. Even if he were to have surgery, I think he is looking at a career change over what he is doing right now. We talked about lumbar epidural steroid injections, but he doesn't seem particularly enthusiastic about these, and I don't think these are likely to help all that much or get him back to his job. I think the current work restrictions are going to be permanent, although they may have to be restricted still more should he get a job within this category and finds that it causes him too much pain. I think he is capable of working at the limited duty as outlined above, but I am recommending a career change, and I don't think it is likely he will go back to the type of work he was doing previously.... Recheck in about two months (03/07/95), at which I would recommend a repeat of the lateral flexion/extension films to make sure that his spondylolisthesis has not progressed anymore. If his symptoms are still under reasonably good control with the modified activity level, then I might be able to rate and release him at that time. Should his symptoms worsen, then fusion surgery would still be an option[.]

On March 7, 1995, Ebelke suggested to Boyles that he try a couple of lumbar epidural steroid injections. Ebelke noted in Boyles' chart:

[A]t the time of the next appointment [Boyles] really will have exhausted what I have to offer from a conservative, non-operative standpoint, and I think he will need to make a decision regarding whether or not to proceed with the surgery or to be rated and released and consider a different line of work.

Boyles received the lumbar epidural steroid injections on March 13, 1995, and March 28, 1995.

Ebelke saw Boyles again on April 18, 1995, and noted in Boyles' chart:

[Boyles] still hasn't decided whether or not to have surgery. He was asking if he is going to be able to go back to his old job as steel worker with the surgery, and I told him that I honestly did not know, but estimated the chances of him returning to that occupation with surgery were probably less than 20–25%.

Apparently he only needs a few more years in that job before he will qualify for some retirement benefits. He seems highly motivated, but I don't want to give him a false hope that the fusion surgery is going to get him back to doing the type of work he was doing before, with extension to the knees and hyperflexion at the waist.... Despite my prognosis for him returning to work, he is starting to consider proceeding with surgery.... I still think he is limited to medium or medium/heavy work only, and apparently no work in this category is available for him.

On June 6, 1995, Ebelke advised Hartford Insurance that he was releasing Boyles from his care because he believed that Boyles was at maximum medical improvement without surgery. Ebelke told Hartford Insurance that Boyles was still under restrictions:

[H]is single biggest difficulty remains hyperflexion at the waist; this is primarily what his job requires, and apparently no job modification is being offered where he doesn't have to perform these repeated hyperflexion activities at the waist.... I had previously released him to medium/heavy type work, with a maximum lift of 75 pounds occasionally and repetitive lifting limited to about 35 pounds, but as an added qualification I don't think he is capable of standing up with his knees locked straight and bending forward at the waist.

. . .

... Unfortunately, it does not appear that he is able to go back to his old job. I think he does need to consider a career change, unless his pain subsides to the degree that he feels he can go back to his old job....

I am not sure I feel I understand the problem with work; I received a note from USA Rebar stating that they were willing to work with patients and provide light duty, yet I am also being told that this man does not qualify for light duty.

[E]ven if he does have the surgery, he may not be able to go back to his old job. This is impossible to predict accurately.

Ebelke recommended a permanent, partial impairment rating of 13 percent of the body. He attributed 50 percent of the rating to the preexisting condition of L5 spondylolysis with Grade I L5–S1 spondylolisthesis and 50 percent to a work-related aggravation of the underlying condition.

Boyles' temporary, total disability benefits ended a brief time later. During this time, he attempted to work within Ebelke's restrictions as a used car salesman for about five months and as a courier for about one month. He worked as a security guard from December 1995 until September 11, 1996.

Ebelke's records indicate that, on June 24, 1996, Boyles asked him about surgery. Ebelke advised Boyles that "it was highly unlikely that he would be able to return to the heavy construction labor industry even following a successful fusion[.]" After further tests, Ebelke scheduled Boyles for surgery on September 11, 1996. On September 11, 1996, Boyles underwent an L5–S1 fusion with instrumentation and bone graft harvests.

After the surgery Boyles continued to consult with Ebelke. On December 16, 1996, Boyles continued to complain of pain, soreness, numbness and stiffness. Ebelke noted in Boyles' medical records:

Recheck around the 5–month post-op point (2–10–97). At that point, we have a couple of options; we can either begin a[n] aggressive physical therapy program (work hardening), but in talking with [Boyles] today, it seems he still harbors a desire to return to work as an ironworker. He apparently only needs a couple more years in the field before he could retire. I have doubts that a posterolateral fusion alone will provide sufficient strength for him to return to that field, but adding an anterior lumbar interbody fusion to this would make it a

lot stronger and would probably give him better chances, if indeed that is his goal. This is generally done with banked bone, so a new bone graft would not be required, and although there are some risks with the surgery, we have had very good results in getting these anterior fusions heeling [sic] with minimal to no complications. This would substantially increase the strength of the fusion, to the point I think it is extremely unlikely that he could disrupt it later, despite any activity level that he might choose to pursue. The only remaining question would be if he [sic] sufficient pain relief in order to return to that field. He seems to have had substantial pain relief thus far with the posterolateral fusion, I would not expect that adding an anterior interbody fusion would take anything away from that improvement, and if anything the pain improvement would either remain the same or else be slightly better. He is going to consider this option for now, and I'll see him again in February.

On February 10, 1997, Ebelke again discussed anterior lumbar interbody fusion (ALIF), but, because of the potential for complications, he suggested that it be a last resort. On April 14, 1997, Ebelke again discussed anterior lumbar interbody fusion and noted in Boyles' records that Boyles was not interested in surgery but wanted to consider it as "an option in the future." Ebelke released Boyles to lift 70 to 75 pounds occasionally and 35 to 40 pounds repetitively.

On August 14, 1997, Ebelke released Boyles from his care. In a letter to Hartford Insurance, he said:

At this time I am releasing Mr. Boyles from my care, although I would be happy to see him again in the future, should the need arise. I would consider ALIF at a future date should he change his mind regarding it. I would still recommend permanent restrictions that would limit him to the medium/heavy work category, which allows an occasional maximum lift of 75 pounds and limits repetitive lifting to about 35 to 40 pounds.....

With respect to impairment, I would recommend an additional 15 percent impairment rating over and above the previous 13 percent impairment rating that I had recommended previously. This takes into account the one level instrumentation fusion and bone graft harvest; the prior rating took into account the spondylolysis/spondylolisthesis (8 percent) and mild loss of range of motion (5 percent). I had previously recommended a 50 percent attribution of that 13 percent impairment due to a pre-existing condition, and 50 percent due to the underlying condition. No such split would apply to the current additional impairment, as the work injury seems to have been the precipitating factor which led to the surgery. I would note that normally, when combining of values like this, using the combined values chart, 15 percent plus 13 percent would actually equal a 26 percent total impairment. However, it would be simpler just to combine the two values for a total impairment of 28 percent.

Boyles' temporary, total disability benefits ended a brief time later. After being released from Ebelke's care, Boyles returned to work as a security guard in September 1997. In October 1997, he switched to a job at Output Technology where he has continued to work.

Boyles filed a claim for workers' compensation from USA Rebar and its workers' compensation insurer, Hartford Insurance. The administrative law judge decided that USA Rebar was not entitled to a credit for alleged overpayments of temporary, total disability benefits to Boyles from January 10, 1995, through June 15, 1995, and from April 13, 1997, through August 13, 1997. He found that Boyles was entitled "to have his medical care left open in the event he wishes to proceed with the anterior interbody fusion as directed by Dr. Ebelke." USA Rebar

appealed this decision to the commission which affirmed the administrative law judge's decision. The commission's award attached and incorporated the ALJ's award and decision.

In its first point on appeal, USA Rebar contends that it was entitled to a credit of $18,370.80 in temporary, total disability compensation benefits paid to Boyles. It asserts that, because Ebelke released Boyles to engage in medium to heavy employment, Boyles was not entitled to temporary, total disability compensation from January 10, 1995, through June 15, 1995, and April 13, 1997, through August 13, 1997.

In deciding an appeal of a workers' compensation claim, our review involves two steps:

> In the first step, the court examines the whole record, viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award, to determine [whether] the record contains sufficient competent and substantial evidence to support the award. If not, the [c]ommission's award must be reversed. If there is competent and substantial evidence supporting the award, the court moves to the second step, where it views the evidence in the light most favorable to the award, but must consider all evidence in the record, including that which opposes or is unfavorable to the award, take account of the overall effect of all of the evidence, and determine whether the award is against the overwhelming weight of the evidence.

*Davis v. Research Medical Center*, 903 S.W.2d 557, 571 (Mo.App.1995).

The burden of proving entitlement to temporary, total disability benefits was on Boyles. *Cooper v. Medical Center of Independence*, 955 S.W.2d 570, 575 (Mo.App.1997). Section 287.020.7, RSMo 1994, defines "total disability" as the "inability to return to *any* employment and not merely

[the] inability to return to the employment in which the employee was engaged at the time of the accident."[2] The purpose of temporary, total disability awards is to cover the employee's healing period, so the award should cover only the time before the employee can return to work. *Cooper*, 955 S.W.2d at 575; *Herring v. Yellow Freight System, Inc.*, 914 S.W.2d 816, 820 (Mo.App.1995); *Williams v. Pillsbury Company*, 694 S.W.2d 488, 489 (Mo.App. 1985). "Temporary total disability awards are owed until the claimant can find employment or the condition has reached the point of maximum medical progress." *Cooper*, 955 S.W.2d at 575; *Vinson v. Curators of the University of Missouri*, 822 S.W.2d 504, 508 (Mo.App.1991). When further medical progress is not expected, a temporary award is not warranted. *Cooper*, 955 S.W.2d at 575; *Phelps v. Jeff Wolk Construction Company*, 803 S.W.2d 641, 646 (Mo.App.1991).

"In determining whether an employee is totally disabled, the main issue is 'whether any employer, in the usual course of business, would reasonably be expected to employ the [employee] in [the employee's] present physical condition.'" *Cooper*, 955 S.W.2d at 575 (quoting *Brookman v. Henry Transportation*, 924 S.W.2d 286, 290 (Mo.App.1996)). This standard applies to all total disability claims—permanent and temporary. *Cooper*, 955 S.W.2d at 575. The test for temporary disability is not whether an employee is able to do some work, but whether the employee is able to compete in the open labor market under his physical condition. *Id.* The commission is to decide whether a claimant is employable on the open market by looking at "the anticipated length of time until the claimant's condition has reached the point of maximum medical progress, the nature of the continuing course of treatment, and whether there is a reasonable expectation that the claimant will return to the claimant's former employment." *Id.*

**2.** We added the emphasis.

In deciding that USA Rebar was not entitled to a credit for its temporary, total disability benefits to Boyles from January 10, 1995, through June 15, 1995, and April 13, 1997, through August 13, 1997, the commission said:

> In this case [Boyles] was released to restricted duty employment which the employer could not accommodate, but [Boyles], throughout that period of time contested by the employer, was under reasonable medical expectation that with treatment and time the employee's functional level would improve, and in fact, sporadically through those periods of time [Boyles] did return to Dr. Ebelke and did receive treatment. This case would seem to be governed by the [c]ourt's pronouncement in *Cooper v. Medical Center of Independence*, 955 S.W.2d 570 (Mo.App. W.D.1997), where the [c]ourt found temporary total disability benefits due until the [c]laimant could find employment or the condition has reached the point of maximum medical progress. The ability to perform some work is not the test for temporary total disability, but rather, the test is whether an employee is able to compete in the open labor market given the employee's present physical condition. In this case, while Dr. Ebelke authored reports releasing [Boyles] from his care with restrictions, for the bulk of that period [Boyles] was unable to find employment and in fact, returned periodically to Dr. Ebelke for treatment.

Viewing the evidence in the light most favorable to the award, the competent and substantial evidence did not support the commission's finding that Boyles was entitled to temporary, total disability benefits from January 10, 1995, through June 15, 1995, and April 13, 1997, through August 13, 1997.

On January 9, 1995, Ebelke decided that Boyles was at "maximum medical improvement for what non-operative treatment has to offer" and that, although Boyles may be a candidate for surgery further down the road, he still would have to change careers even if he had the surgery. He concluded that Boyles' being able to do the type of work he had been doing was not likely and that the work restrictions would be permanent. Although Boyles remained under Ebelke's care after January 9, Ebelke concluded as of January 9 that Boyles had reached the point of maximum medical progress, so Boyles should not have continued receiving temporary, total disability payments from January 10, 1995, through June 15, 1995. *Cooper*, 955 S.W.2d at 575.

■ The temporary, total disability payments from April 13, 1997, through August 13, 1997, present an issue of whether the evidence allows a reasonable inference that no employer could have been expected to hire Boyles under his condition during that time. The reasonableness of such an inference depends partly on how long the claimant's reaching the point of maximum medical progress will take. *Id.* at 576–77. "If the period is very short, then it would always be reasonable to infer that claimant could not compete on the open market. If the period is quite long, then it would never be reasonable to make such an inference." *Id.* at 577. On April 14, 1997, Ebelke noted in his Boyles' records that he anticipated that the point of maximum medical improvement would be September 1997. Ebelke also said:

> [Boyles] has gone through an extensive physical therapy program, with the outcome being basically the same restrictions as he had previously[;] that is, he seems capable of meeting the medium/heavy work category, but unable to meet the job demands of a iron worker.... At this time, I would ... release him to medium/heavy work, which is basically the same restriction as he had when I released him in 1995. This allows an occasional maximum lift of 70 to 75 pounds, and limits repetitive lifting to approximately 35 to 40 pounds.

■ Boyles did not present any evidence that he was unable to obtain employment; nor did he offer any expert

testimony concerning his ability to obtain employment on the open labor market under his condition. USA Rebar was not obligated to pay temporary, total disability benefits simply because Boyles remained under Ebelke's care, even if Ebelke had some reasonable expectation that Boyle's functional level would improve. *Id.* at 574. The commission's inference that Boyles was unable to obtain temporary employment on the open labor market when he was under medium to heavy work restrictions was unreasonable, especially given Ebelke's doubts just three months after surgery that Boyles would be able to return to his former occupation.

■ In its second point, USA Rebar claims that the commission erred in finding that Boyles was entitled to have his case "left open" in case he decided to have the anterior lumbar interbody fusion surgery. USA Rebar argues that the evidence did not establish a reasonable probability that Boyles would need the anterior lumbar interbody fusion surgery. We disagree.

■ The burden of proving entitlement to an award of future medical care was on Boyles. *Sifferman v. Sears, Roebuck and Company*, 906 S.W.2d 823, 828 (Mo.App. 1995). His obligation was to establish a "reasonable probability" that he would need future medical care. *Id.; Mathia v. Contract Freighters, Inc.*, 929 S.W.2d 271, 277 (Mo.App.1996). Boyles met his burden.

Boyles testified:

> I still have some lower pain in my back. About once a week I have numbness in my left leg. In the morning I'm stiff. I have to take hot showers before I can go to work to loosen up and on real wet and damp days my back really hurts[,] and I might take a pain pill twice a week.

When Ebelke released Boyles from his care on August 14, 1997, Ebelke suggested that Boyles consider fusion of the anterior lumbar interbody at a future date. Ebelke testified that the surgery was not necessary in August 1997, but optional. Ebelke recognized a "remote possibility" that Boyles would have future medical problems relating to his fusion and said that the surgery would not ordinarily be done if the previous surgery's fusion was solid unless pain significantly increased.

At his attorney's request, Boyles saw another physician, P. Brent Koprivica. In evaluating Boyles, Koprivica concluded:

> [I]n my opinion Mr. Boyles' medical should be left open in the event that he elects to have an anterior interbody fusion based on his disabling low back pain. As I pointed out in my November 18, 1997, report, this was offered to him, but at this point he has elected not to have the procedure performed. In my opinion within a reasonable degree of medical certainty, this procedure would be appropriate if he elected to have the procedure performed and, as a consequence, the medical should be left open in the event that he elects to have the procedure.

In light of this evidence, we cannot say that the commission erred in allowing for future medical care of Boyle's condition; nor can we say that the award was against the overwhelming weight of the evidence.

Substantial and competent evidence supported the commission's decision to allow future medical care of Boyles' condition. We reverse, however, the commission's decision that USA Rebar was not entitled to a credit for the temporary, total disability payments to Boyles from January 10, 1995, through June 15, 1995, and April 13, 1997, through August 13, 1997.

THOMAS H. NEWTON, Presiding Judge, and JAMES M. SMART, Jr., Judge, concur.